Good afternoon, Your Honors. Tavora Allen for the appellants, and I'd like to reserve two minutes for rebuttal, please. All right. No problem. To pursue a class action, the plaintiffs in this case need to be able to show that all class members who bought generic Lamotrigine would have paid less if two generic manufacturers had been selling the drug instead of one. And the only way the plaintiffs here propose to make that showing with common evidence is their evidence that average market-wide price for a generic tends to be lower when there are two manufacturers on the market instead of one. Let me just skip ahead a little bit. We've got the arguments. One of the questions I have is whether the Tyson Foods no reasonable juror standard applies here. Can you address that? Your Honor, as Tyson Foods makes clear, the no reasonable juror standard only applies in a very particular legal context, and that is in the FLSA context. Well, that was the context, but are you sure it's just limited to the FLSA? Well, Your Honor, I think that's absolutely a fair point, and let me say it a little bit more broadly. If there is a situation, whether because of a legal regime like the FLSA or for some other reason, where there is no risk that a case could devolve into individualized issues, it is true that a district court might not necessarily have to address evidence related to each of those issues. So in the FLSA, because the statute explicitly provides for the use of representative evidence, that representative evidence is permitted whether a plaintiff is litigating alone or in a class action. Is that the distinction, the only distinction you rely on, or the fact that it's Rule 50, and in that case what we're seeing is a judgment notwithstanding the verdict? Your Honor, I think that's true, but as the Ninth Circuit made clear in the recent Kansas City Royals decision, it applied the Tyson Foods case, and it went on to say at Note 27 that the Supreme Court itself in Tyson made clear that the no reasonable juror standard is limited to the wages and hours context. So I think the case law we're seeing following Tyson Foods, applying that standard, has in fact limited it on that ground. Well, that may be the Ninth Circuit, but we get to address that independently, and so we're asking your view. Absolutely, Your Honor, and I think under this Court's precedent, the Court absolutely has an obligation to resolve factual disputes that are relevant to whether an element is susceptible to common proof. This Court laid that out for the first time in hydrogen peroxide. That case was remarkably similar to this one. The plaintiff there argued that it could show antitrust injury using common evidence, and the defendants had an expert who argued that the plaintiffs mischaracterized the relevant market. The district court certified a class because the plaintiffs had presented evidence to support their theory. That's the no reasonable juror standard, and this Court reversed, holding that a district court errs as a matter of law when it fails to resolve factual disputes relevant to predominance, and it went on to say that the district court must find by preponderance of the evidence that the plaintiffs can establish injury using common proof, even if that requires addressing issues that overlap with the merits or weighing conflicting evidence. Now, that is completely inconsistent with the no reasonable juror standard. A no reasonable juror standard is like summary judgment, where a court is not supposed to weigh evidence or resolve factual disputes. But, for example, this court went on in the Harnish decision, which postdated Tyson Foods, to make clear that a district court can't rely on what it called a mere threshold showing that a class-wide method of proof is sufficient. It can't rely on that being plausible in theory. This court has said time and time again, the rule is district courts must resolve factual disputes that are relevant to class certification, even if they overlap with the merits. Now, even the Supreme Court has recognized this in the Halliburton case. So in Halliburton, the Supreme Court was addressing class certification in the securities fraud context. And in the securities fraud context, plaintiffs often attempt to rely on basic reliance, so that they can use class-wide evidence to show reliance. The factual predicate to basic reliance is an efficient market. And what the Supreme Court said in Halliburton is, if you're going to use basic reliance as your common evidence, you have to show an efficient market at class certification. And the Supreme Court went on to say that defendants must be allowed to introduce evidence to defeat that presumption at the class certification stage. Do we even reach these issues? Because we do have to look at whether there are disputed issues in material fact. And aren't there a couple others that are front and center here, including what is the counterfactual scenario that should be considered? That is, that there's a discounted brand and authorized generic? Is it just the authorized generic? This looks like there's open questions about whether the contracting strategy was known to TEVA, and the reason for its further discount, that is, if it acted on it or not, had knowledge of it or not. Aren't those threshold issues that need to be resolved before there's even a consideration of exactly what kind of evidence can and should be considered? Your Honor, let me answer that in two parts. The first is, I don't think the court has to reach that issue, because what is undisputed is that purchasers here paid a wide range of prices for generic Lomotrigine, even when TEVA was the only manufacturer on the market. Some purchasers paid as little as $1, and some purchasers paid as much as $3. That evidence is undisputed. Plaintiffs may dispute the cause of those discounts, but they don't dispute that variation. And where you have that sort of variation, averages cannot be used as common proof, because they don't show injury to every class member. Your Honor, let me just say, what if, and sorry, I know there's a second part to your question coming, but what if there was variation, but there was some commonality among the variations, such as there was a difference of $1 up to $3, but everyone is alleged to have paid 10% more, even with that variation? It seems then that the fact of variation isn't dispositive. I think that's absolutely right, Your Honor. It's similar to the Boghossian presumption that we see in the price-fixing context. Sometimes you can have a situation where there is a range of variation, but that range of variation, the entire range is completely distinct from the but-for price, so to speak. And where you have that circumstance, it doesn't matter if there is individual variation among the prices the plaintiffs pay. Sorry for interrupting again, but just so I understand your point, to trace it, what you're saying is not only is there individualized variation, but there's no common thread for that individualized variation that would at least predominate over the individual circumstances that would otherwise explain that variation. That is exactly right, Your Honor. And just to put some concrete numbers on it, the plaintiff's position, which we don't agree with, but the plaintiff's position in this case is that a second generic on average brings down the price by 15 percent, okay? So 15 percent is their threshold of what the price should have been in the but-for world, absent the anti-competitive conduct. But this record undisputably shows that TEVA offered discounts in the actual world up to 20 percent. So I get that there's variation from the average to what those were. One of the things that I noticed is that the district court certified a class from February of 2008, I believe, until January of 2009. But TEVA didn't enter the market until July of 2008. And so I guess my thought is if we want to talk about what TEVA charged, that may be interesting information from the period those last six months, that last 180 days. But what about that first five months where isn't plaintiff's number one claim that there was a pay for delay? And isn't that more common to the first five months? So plaintiffs have two distinct theories of injury. One is the brand generic theory of injury. And the theory there is purchasers who brought the brand before the generic was on the market would have paid lower prices for the generic had there been an earlier launch. That's why the class period can start before generic launch. But with respect to the 33 putative class members who are what we call generic-only purchasers who only bought the generic, their theory of injury is that had there been a second generic competing with TEVA, those prices would have been lower. So for those purchasers, the only proof of injury that they rely on is that on average prices are lower when a second generic enters the market. Aren't there two theories even there? One that it's a discounted brand. It's a contracting strategy plus an authorized generic. And the other is that it's the authorized generic instead of the contracting strategy. Haven't they floated both those theories? Yes. They floated both of those theories. But both of those theories still depend on evidence about on average what happens to the price of a drug when there is additional competition. Let me say it that way. So your approach is it's not simple. It's not actually the combination of the contracting strategy and the authorized generic that would create individualized issues. Even if we were looking at just a comparison of a second generic alone versus one in the market, that necessarily presents individualized issues defeating predominance. In a market that is characterized by individual price negotiations, as this record undisputedly makes clear, I think it follows from the logic of the Gates decision from this court that averages are not necessarily probative of any individual's injury because any individual class member may have paid above or below that average. Absolutely. Sorry again to interrupt. I mean, this is it seems a remarkable proposition that there would be per se plaintiffs would be unable in a reverse payment situation to establish predominance any time we're talking about generics in the marketplace. Your Honor, I don't think that's necessarily true. I'm not saying averages are always off limits. I think there are certainly times where, first of all, you could have a product that's a commodity product where there might be evidence that everybody pays the same price, and therefore an increase or decrease would affect all plaintiffs equally. Plaintiffs could run certain analyses, like a regression analysis, to show that movements in the market affected all plaintiffs in the same way. Or you might have a statutory scheme like the FLSA that has a presumption that you can use representative evidence. But here, where none of those case instances apply, the reality is that averages are concealing uninjured class members. Our analysis shows that 25 out of 33 generic-only purchasers were likely uninjured because they got a better deal in the actual world than they would have under plaintiffs' assumption. Plaintiffs' averages take widely disparate data and condense them into a single number that is concealing those uninjured class members. So, it's not your position that a class can't be certified that would include uninjured class members, right? That's right, Your Honor. De minimis amount of uninjured class numbers, but we're talking about 25 out of 33. That's the vast majority of generic-only purchasers, and it's nearly a third of the entire putative class. So, whether the test is all or nearly all class members need to show injury, I think we've certainly shown that the plaintiffs can't prove that. Isn't that number taking account of the combination of the contracting strategy and second generic? That number looks at the discount that an individual purchaser got with the contracting strategy compared to the price plaintiffs say that purchaser would have paid in a world with two generics using plaintiffs' assumptions. Can I ask a question? And this relates to the motions to seal. I understand that there's some request still to have certain information in the transcripts, in the record, and in the brief sealed. Can you just explain in a way that we haven't sealed the courtroom for this question, but maybe at a level of generality as to why price information, and from what I can tell it almost all relates to the 07-08 time period, would need to be sealed? The appellants are not making that request. We took the court's guidance after the Avandia decision. I think the Third Circuit has clarified the threshold for motions to seal, and we are not seeking to seal any of the information in any of the pleadings in this court. All right. That question may come to the other side when there are red lights on. No problem. We'll get you back on rebuttal. Thank you. Whenever you're ready. May I please support Kaitlin Coslet for the plaintiff's appellees? Your Honors, I would like to start by addressing my opposing counsel's claim that plaintiffs are pursuing distinct theories of injury here. We are not. We are challenging a pay-for-delay agreement under which the brand company agreed to delay, to not launch its authorized generic, and the generic company agreed to delay the time of its launch. But then the question is, is the injury, are they individualized, or is there a threat of predominance, as Judge Phipps notes? And it seems like, with respect to the contracting strategy, there's an individual way that GSK is dealing with things and then with various purchasers, and then Teva gets word of it and preemptively jumps in and begins to deal individually with certain other purchasers. And that doesn't seem to bode well for a Rule 23 class action predominance analysis. Your Honor, I would like to challenge a few of the assertions that underlie defendants' brand discounting defense. There is simply no evidence in the record, no contemporaneous documents, showing that Teva, in fact, lowered its price in response to GSK. That just doesn't exist. Plaintiffs had no even inkling that defendants would raise this defense at class certification until Ms. Kavanaugh's declaration was provided to plaintiffs with defendants' expert reports. But doesn't the party requesting certification bear the burden of proving certification? Sure. And so an absence of that evidence doesn't seem to tilt the balance in favor of certification. It just says there's no evidence there. But there's still a burden that has to be met, and you typically don't meet a burden by just saying there's no evidence of the contrary. Absolutely. And we've met our burden here, Your Honors, because we have evidence capable of proving at trial a class-wide impact. That evidence includes the very same forms of proof that have been repeatedly found sufficient in pay-for-delay cases, including in two cases affirmed by this Court in Kedor and Modafinil. So the forms of evidence we have are defendants' expectations that the launch of an authorized generic would drive down generic prices substantially. Those expectations are consistent with overwhelming governmental and academic studies showing the same thing. And we have a third source of evidence, which is that generic prices were much lower than the brand price, and that generic prices fell even further when multiple generics launched, as opposed to when there was only one generic on the market. Defendants argue that these averages are hiding uninjured class members, so there's, quote, meaningful variation. But that claim, Your Honors, is frankly refuted by the evidence that every single class member paid lower generic prices than they paid for the brand, and every single class member paid even lower generic prices with multiple generics on the market, as compared to when there was only one generic on the market. But isn't there a right comparator that actual prices, which included the contracting strategy, doesn't that make this a different case than if we were just comparing a second generic entering versus not? Your Honor, we absolutely have to show that the actual price that class members were paid was inflated by defendants' agreement not to launch an authorized generic. And we have shown that here. We've shown that because, despite defendants' after-the-fact argument that there was brand discount, that Teva lowered its generic price in response to brand discounting. There is simply no evidence capable of convincing a jury of that in the record. Our evidence shows that Teva did not lower its price in response to brand discounting. Isn't that fact-finding that has to be resolved by a prior effect? No, Your Honor, because what the court needs to find is whether plaintiffs have evidence capable of proving class-wide injury at trial. That's what we have. Put another way, as the Supreme Court recently did in Tyson Foods, the inverse of that is that if no reasonable juror could credit our evidence and find class-wide injury, then certification must be denied. But that's not the case here. We have more than sufficient evidence from which a jury can find class-wide injury on a class-wide basis. Isn't the pushback that, no, each contract was individually negotiated and each was on its own terms, and that the only way to truly find out if there was a higher price payment to look at each individual contract? I mean, the core theme that they've raised is that this is individually negotiated contracts. And so even if there might be some suggestion that this scenario might raise prices, the question is predominance. And don't we have to look at each individual purchaser to see whether they increased the price that they paid? Your Honor, that is not the standard under hydrogen peroxide, and it's not the standard under Tyson Foods. Hydrogen peroxide requires a rigorous analysis. My concern is I don't see the rigorous analysis with respect to the competing experts here. Your Honor, the district court found that defendant's argument, this brand contracting strategy, if anything, went to damages and did not defeat plaintiff's proof of class-wide impact. And, you know, and this court has, you know, has in the Marcus case found that where a district court, maybe there are instances where the court of appeals might prefer a more explicit discussion. The point you just made, I think you do say on page 38 of your brief that Dr. Lamb only relied on averages for his damages calculation. But how can that be, considering that he relied on the economic literature, Teva's general forecasting documents, and transaction data, all of which used averages to show antitrust injury, not damages? Your Honor, I think that the way that the reason those are not averages is that what those show is that prices fall with more generics on the market. It's not that we're relying on a particular magnitude of price drop. The point is that as Teva recognized and as the literature recognizes, prices fall substantially. And the other thing I would say about averages, there are cases suggesting that averages may be problems, may be problematic in terms of proving class-wide impact. And we're not using averages here. But even if we were, we have this piece, this evidence that each class member's prices fell with more generics on the market. That makes clear that the averages are not hiding meaningful variation among class members that was present in those other cases. Defendants rely on the Gates case, but the plaintiff's expert there admitted he had no evidence whatsoever related to class-wide injury. That's not the case here. We understand how generic competition plays out. We understand that Teva understands it, and we know what actually happened here. But didn't Dr. Lamb basically offer an average hypothetical price? In calculating damages, he estimates the buffer price. I mean, but also you've got individual – it looks to me with the contracting strategy and the preemptiveness of how Teva reacted to the contracting strategy once it found out is that you have individualized purchasing patterns for a host of people here. And it really seems not to be a good fit with respect to predominance for class action. Sure. And the question is not defendants – I think defendants' argument rests on an improper reading of hydrogen peroxide. Hydrogen peroxide says certification is appropriate where there's evidence capable of proving class-wide impact. On the last page of defendants' reply brief, they say – Hydrogen peroxide also says when you have competing expert testimony, you've really got to analyze it, that this is different than the usual type of case, that you've got to dig in and do it at the Rule 23 certification stage. Sure. And I would direct – and, Your Honor, I would say this. The court defendants' argument is based on such thin evidence that the disparate court analyzed it and found it lacking. And I would also say that, Your Honor, our expert – defendants' experts' entire opinion related to class-wide impact is based on Ms. Kavanaugh's declaration, her after-the-fact declaration, which is at odds with all the evidence in the case. All of the documents showing Teva consistently expected to and then did launch at a price of 50 percent of the brand price. And so it's hard to – it is impossible for that evidence, that declaration, and all of the analysis that rests solely on that declaration, to be so convincing that a jury would not be capable of finding class-wide impact based on our forms of common proof. Is it your position that Teva didn't know about the contracting strategy or that she just didn't act on the strategy? Teva did not lower its price in response to the brand discounting strategy. But the question was, when did it know? According to Ms. Kavanaugh's declaration, they learned – according to her very vague declaration, they – Teva learned of it at some point prior to launch. And in the appendix – Prior to the launch of the contracting strategy, right? Learned of the brand contracting strategy. Is it your position that they didn't – that that's not true, that they didn't know? No, our position is that they did not lower their prices in response to brand contracting. The spreadsheet that indicates a before-and-after pricing is reflecting what – what motivation for change? These spreadsheets are – I've stared at them. They don't mean – they don't mean what defendants say they say. There's no evidence. Nobody says – it's not as though the spreadsheets are accompanied with a cover email saying, the price fell here because of brand contracting. It's two different spreadsheets that just list a bunch of numbers by customers. Our expert compared the, quote, prices in those spreadsheets to the prices that class members actually paid, found that some class members paid higher prices than the, quote, prices in those spreadsheets, and some class members paid lower. And in some cases, the numbers were off by 80 percent. So the relationship between that spreadsheet and what class members actually paid doesn't exist. If you don't dispute that Teva knew – I mean, if they, in fact, knew of the contracting strategy, then isn't it logical that they then would be taking action in response to it? No, Your Honor, because the way that this market works, brand companies often try to retain brand sales through brand discounting strategies or other strategies because the brand company has an interest in maximizing brand sales. They get to keep 100 percent of the brand sales. Brand companies also, like GSK, have an interest in launching an authorized generic in order to capture about half of the sales that go generic. Teva is only interested – Teva, as a generic seller, is competing for the generic sales. It's going to get 100 percent of the generic sales because GSK has promised not to launch an authorized generic. Teva's pricing of the generic lamictal is completely unaffected by any purported brand contracting strategy. And I would say that part of the way that we know that is true is Teva's expectation – between brand and generic? I mean, you can have 100 percent of one pie, but if no one wants to eat that pie, then it would seem that the pie that you have, you've got to do something, maybe lower the price of that pie if no one otherwise wants to eat it. So it doesn't feel – so what you said seems to assume that brand and generics never operate as economic substitutes for one another. Is that – do you have – maybe you have evidence of that. Maybe your expert said that or someone else did. We do have evidence, Your Honor, that GSK would have engaged in both an authorized generic and launched brand discounting strategies because those strategies are complementary. We have that in the form of defendants' experts' testimony, defendants' testimony about how those – how an authorized generic competes for generic sales and how brand discounting works. We have evidence. They have a different counterfactual scenario, and which one are you pursuing? Is it that there was an addition to or that it was going to be a substitute for? I'm sorry, can you repeat that? That seems to be a different counterfactual scenario that a court would need to consider in evaluating questions of predominance. So is your theory that there was going to be – there should have been a second generic in addition to the contracting strategy or that it would have been an authorized generic in lieu of the contracting strategy? Our theory is that the evidence is capable of showing that GSK would have done both brand contracting to retain as many brand sales as possible and also launched an authorized generic absent its promise to Teva not to do so, that it would have done both. And these are not inconsistent with the theory I've been mentioning earlier, which is that the evidence is capable of showing that, in fact, Teva did not lower its price in response to brand discounting. If the jury finds for us on either of those two defenses, that is sufficient. And so the jury is capable of finding no price response. You can see that, by the way, Your Honors, on A838-39 where Ms. Cavanaugh, the declarant who's at issue here, she receives an email July 9th, two weeks before Teva's generic launch. The email she receives says something about Teva's plan to launch at 50% of the brand price. Ms. Cavanaugh responds, she asks for the calculation to be revised in one way, does not ask the person to redo the 50% expectation. The person sends back another analysis, again, using that 50% of brand price assumption. Then we know Teva, in fact, launched at 50% of the brand price. The jury is capable of crediting that evidence of finding that Teva did not lower its price. Just because I'm almost out of time, Your Honors. You're not out of time. You're on our time. Go ahead. Okay. One thing I would like to say is that so we've talked about the two ways that a jury is more than capable of finding for us with respect to class-wide impact on a class-wide basis. The other analysis our expert did is actually to look at the magnitude of the prices that class members would have paid if defendants somehow convinced the jury on the basis of this Cavanaugh declaration that's refuted by all of the other contemporaneous evidence in the case that Teva lowered its price. So first defendants have to convince the jury Teva did lower its price in response to brand contracting. Then defendants have to convince a jury that GSK would not have done both an authorized generic and brand contracting. Again, we think the evidence is more than capable of convincing a jury that GSK would have done both, that it's economically rational to do both brand contracting and brand discounting, brand contracting and launch an authorized generic. The third way that a class, that the jury can find class-wide evidence based on our common class-wide proof is that the magnitude of the price drop associated with an authorized generic is larger than even the price drop that defendants' experts claim resulted from Teva's supposed price response to the brand discounting set. Everything you're talking about seems to come back to averages. Your Honor, our expert, Dr. Lamb, looked at each class member's price in that hypothetical scenario, which a jury is not going to be required to find, and he went through and looked at each class member's price in the real world and also the price that they would have paid. And the magnitude, I would note, the price drop is much larger with the authorized generic as compared to in response to brand discounting. And that, I think, Your Honor, is clear because Teva, the seller of this repeat player in the generic market, they expect to sell at a 15 percent discount relative to the brand price if they face competition from an authorized generic. But doesn't that go back to Judge Phipps' question? That means we have to take account of the extent of the discount for the brand, and to the extent that there is a response to that on the generic side, what effect that would have had. It seems like at that point, if you are looking at a comparison of a world with a discounted brand, and it's in the same marketplace as the generic, that you have to make individualized determinations when there's individual price negotiations for both the discounted brand price and then on Teva's side, in responding to that and making individual determinations as to a further discount, if that is what is established. That's not true, Your Honor, because our evidence that the price drop is so much larger, the price drop attributable to a competition from an authorized generic is so much larger than the price drop attributable, even according to the defendant's expert to brand discounting, is capable of convincing a jury of class-wide impact. And this Court has previously rejected arguments like the one defendants make here, that any variation among class members in terms of prices paid defeats predominance. That's what this Court found in the Kador case. In Kador, there was actually evidence that one class member paid a higher generic price than it paid for the brand. And there was a predominance challenge to the class certification opinion in that case. And the Third Circuit held that despite that observable pricing variation, predominance was met on the basis of the same three forms of evidence we have here. And we do not have that kind of pricing variation in this case. We have, again, Your Honors, because I think it's so compelling, I'll repeat it, we have every single class member's prices responding in the exact same way in response to generic competition. Let me just ask you about that proof. One of the things you rely on is your expert. Speaking of our precedent, it seems that our precedent requires that experts who opine at the class certification stage have to go through a Daubert hearing or at least be Daubert certified. It looks like from the briefing and maybe the record that this didn't happen in this case, and it seems that everyone's kind of now just saying, well, you know, no one's challenging it, it's all waived. But it didn't happen, it appears. And then the argument here is we don't need to worry about that because although it's binding precedent, everyone waived a challenge to that. Am I capturing the dialogue close to how you see it? Sure. What I would say, Your Honor, is that defendants did not file a Daubert as to Dr. Lamb. That is not the basis for us believing that Dr. Lamb's opinion is sufficient under Rule 23. But it does mean that Dr. Lamb's opinion is undisputedly admissible and reliable under the Daubert standard, but that's a different standard than the Rule 23b3 predominance requirement. No, no, I know, but it's a procedural point. Yes, it's a procedural point. Speaking of procedural points, would you mind touching on that question I asked your opponent about why price data from 07 and 08 might still need to be sealed? Sure, Your Honor. Our class members feel like the exact prices that they pay is confidential because it reflects their bargaining power. Even by this point in the Wayback Machine? Well, these are ongoing relationships, Your Honor, between class members and manufacturers that are still selling them. So how far back should it go? I mean, what if it was prices that they paid at the very, very outset of the brand launch or at any point in time? How far back do prices need to go? This is 12 years ago. I mean, does it go back if this market existed 50 years ago? Would 50 years, would they still kind of think that that's still the prices they paid and would still be important? It's a question of degree, but I'm asking you for some guiding principle for what degree we should use. Because 12 years in a commercial area, especially when prices can change somewhat dynamically, strikes me as a while, right? You know, I think our class members would say that those prices still have some relation to the prices and agreements they have with the manufacturers today. Can I touch on the Tyson Foods case? I'm sorry. I have one question for you, then you can give you a chance to get your point in. I asked your opposing counsel about Tyson Foods. Does the no reasonable jurors standard apply here? Tyson Foods had a jury verdict dealing with the FLSA. And it wouldn't. It doesn't seem that this sentence in Tyson Foods really has a tie in here. Your Honor, it does apply here. And I would say two things about that. The first is that Tyson Foods, it is post-trial, but none of its discussion, none of the Supreme Court's discussion of the Rule 23 rests on that. In analyzing whether predominance is met, the Supreme Court cites to non-FLSA-specific Rule 23b3 authority, including the Newburgh Treatise on Class Actions. In its evaluation of the no reasonable, in setting forth the no reasonable juror comment, the Supreme Court cites to the Anderson v. Liberty Lobby case, which is a libel case. So that no reasonable juror statement applies in this case. And the other thing I would say, Your Honors, is we don't view that comment as a sea change from hydrogen peroxide. It's really just a clarification or almost just hydrogen peroxide stated in the inverse, which is hydrogen peroxide. This court instructs that certification predominance is met if there is class-wide evidence capable of proving injury at trial, class-wide injury at trial. Tyson Foods says you could deny certification on the predominance ground only if, quote, no reasonable juror could find class-wide injury on the basis of class-wide evidence. It's really the flip side of capable of proof at trial. Of course, at trial, when you're thinking about whether evidence is capable of proving class-wide impact, you're evaluating whether a reasonable juror could so find. When you say reasonable juror, it sounds like you mean juror after a verdict. I just I don't think it's I think they're evaluating a rule 20 B3. The Supreme Court was evaluating a rule 23 B3 challenge. It is post-trial, but they're asking whether the plaintiff's proof was sufficient to prove class-wide liability, class-wide injury. You want to make a point before you sit down? So should I keep going or you want to make a point before you sit down? OK, so that's what I would say about Tyson's food. And the last. Yet the last thing I would say, Your Honors. Oh, sorry. The the harnessed. Sorry, I'll go to Halliburton. Defendants cited Halliburton. I think they misread Halliburton. Halliburton and the securities cases defended site are just unlike this case there. There is a question. There is no ability to prove class-wide impact unless the plaintiffs come forward and satisfy the basic presumption by proving market efficiency. That's a security specific rule of law that is not applicable here. Here we have used the same three forms of proof, the same basic forms of proof that have been repeatedly found sufficient, including by this course. This court in Cajor and Modaffino. And the last thing I'll say about Halliburton before I sit down is that in that case, the court Supreme Court recognized that. Common issues could be found to predominate, even if there were individualized reliance defenses that the defendants might wish to assert as to certain class members. That's akin to the defendants argument here that they would like to assert assert class member specific arguments related to whether some class members may have benefited from brand discounting. Again, the evidence shows that that is not the case. And defendants would like to come forward and prove that some class members were uninjured. That that possibility that that defendants would like to bring individualized offenses. Again, it's not it's not sufficient to defeat predominance under hydrogen peroxide or Tyson foods. Thank you very much. Thank you, Your Honor. This court made clear on hydrogen peroxide that plaintiffs cannot plausibly carry their burden to show that antitrust injury is suited for common proof. When their common proof relies on a mischaracterization of the relevant market. That's exactly what happened here. Teva never set prices as if it was the only company selling generic remote regime from day one. It faced price competition from the contracting strategy, which forced Teva to preemptively lower prices for some purchasers, but not others. Just like it would have had it faced competition from a second generic manufacturer. That is reflected in the contemporaneous evidence. It's in the record at A475 and A338. The contracting strategy was unique. GSK told some of its largest customers that it would offer them 40 to 50 percent discounts on the brand. But in exchange, what those customers had to do was, if a patient came in with a prescription for the generic, they had to dispense the brand. So from Teva's perspective, the contracting strategy was just like another generic competitor. There's disputed facts on this point, and it seems so critical to the fact of injury for individual pharmacies in the marketplace. Are you asking for a vacated remand? Are you asking for a reverse? Is the evidence so clear that the latter could even be a disposition? Well, Your Honor, I do believe that this court could reverse the grant of class certification because plaintiffs have no evidence, let alone common. They have no evidence that can show injury to any purchaser. At a minimum, if there are disputed factual issues that are predicates to the plaintiffs being able to use common evidence, the district court was required under this circuit's clear case law to resolve those factual disputes by preponderance of the evidence. The district court was crystal clear that it would not engage with the defendant's arguments about the contracting strategy because, in its view, it went too far into the merits. That was reversible error. So at a minimum, Your Honor, I think that this court should remand. For the district court to conduct the rigorous analysis, it was required to do under Rule 23. Thank you. Thank you very much. Thank you to both counsel for very well-presented arguments. We'd ask counsel to get together with the clerk's office and have a transcript prepared of this oral argument and then just split the costs, if you would. Thank you very much for being with us today. All right.